**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

COLUMBUS LIFE INSURANCE COMPANY,

*Plaintiff*,

v.

WILMINGTON TRUST, N.A., as Securities
Intermediary,

*Defendant*.

Civil Action No. 20-7959

(JMV) (MF)

**OPINION**

**John Michael Vazquez, U.S.D.J.**

This case concerns a $5 million life insurance policy. Plaintiff Columbus Life Insurance Company, the issuer of the policy, says that the policy is an illegal stranger-oriented life insurance ("STOLI") policy and seeks a declaration from the Court that the policy is void *ab initio*. Defendant Wilmington Trust, N.A., the owner and beneficiary of the policy, seeks to collect the policy's death benefit and has pleaded several affirmative defenses and counterclaims.

Presently before the Court are Plaintiff's motions to strike certain affirmative defenses and dismiss certain counterclaims. The Court reviewed all submissions made in support of the motion[1] and considered the motion without oral argument pursuant to Federal Rule of Civil Procedure 78

---

[1] Plaintiff's omnibus brief in support of its motion to strike affirmative defenses and dismiss counterclaims will be referred to as "Moving Br.," D.E. 10-1. Defendant's omnibus opposition brief will be referred to as "Opp. Br.," D.E. 13. Plaintiff's reply brief will be referred to as "Reply," D.E. 15. And Defendant's sur-reply brief will be referred to as "Sur-Reply," D.E. 18-1.

and Local Civil Rule 78.1(b). For the reasons that follow, Plaintiff's motion to strike is **GRANTED**, and its motion to dismiss is **GRANTED in part and DENIED in part**.

## I. FACTS AND PROCEDURAL HISTORY[2]

Plaintiff Columbus Life Insurance Company ("Columbus") is an Ohio corporation with its principal place of business in the same state. CC ¶ 6. Defendant Wilmington Trust, N.A. ("Wilmington") is a national banking association incorporated in Delaware with its principal place of business also in Delaware. *Id.* ¶ 5.

On or around November 30, 2007, Carl Goldman applied for a $5 million life insurance policy from Columbus. CC ¶ 18. A policy (the "Policy") was then issued, effective November 21, 2007. *Id.* According to the terms of the Policy, Columbus could not contest the Policy after two years from the effective date. *Id.* The Policy expressly provided that Columbus would "pay the Death Benefit to the Beneficiary" when it received proof of death of the insured. *Id.* ¶ 25. The Policy' annual premium was $285,000 per year with an additional first-year premium of $265,000. *Id.* ¶ 20.

The Policy was held by Goldman through the Carl Goldman Life Insurance Trust (the "Trust") and the Trust was also the beneficiary of the Policy. *Id.* ¶ 19. The Trust was responsible for paying the Policy's premiums. *Id.* ¶ 20. The initial trustee was Steve Levenson.[3] *Id.* ¶ 19. Goldman "established, created, and funded the Trust (which held ownership of the Policy) through

---

[2] The facts are taken from Defendant's Answer, Affirmative Defenses, and Counterclaims, D.E. 6, which "the Court accepts . . . as true and draws all inferences in the light most favorable to the non-moving party." *Duke Univ. v. Akorn, Inc.*, No. 18-14035, 2019 WL 4410284, at *1 (D.N.J. Sept. 16, 2019) (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008)). The portion of this pleading asserting counterclaims, D.E. 6 at 14-34, will be referred to as "CC." The portion of this pleading that serves as the Answer and raises affirmative defenses, D.E. 6 at 1-14, will be referred to as "Ans."

[3] Neither party identifies Steve Levenson's relationship to the insured.

a loan." *Id.* ¶ 20. On or around May 21, 2010, Columbus received a request to transfer the ownership and beneficiary of the Policy from the Trust to an entity known as Life Trading Trust. *Id.* ¶ 21. The Policy permitted such a transfer, and it became effective June 4, 2010. *Id.* Columbus then received, on January 3, 2019, second request to transfer the ownership and beneficiary of the Policy from Life Trading Trust to Wilmington. *Id.* ¶ 22. On the same day, Columbus provided Wilmington with a notice, which confirmed that Wilmington was the owner of the Policy, and on January 4, 2019, Columbus provided Wilmington with a letter confirming that Wilmington was now the beneficiary of the Policy. *Id.* ¶ 23.

The Policy was transferred to Wilmington on behalf of a third-party investor who purchased a portfolio of policies. *Id.* ¶ 24. Prior to purchasing the portfolio, the third-party investor reviewed the Policy's chain of title and the "myriad representations by Columbus that the Policy was valid and in force[.]" *Id.* Because Wilmington and the third-party investor were not involved in the Policy's initial procurement, they understood that Columbus's approvals of the ownership and beneficiary changes meant that the Policy would not be challenged when Goldman died or at any other time. *Id.* Columbus also continued to solicit annual premium payments, and Columbus provided Wilmington with a verification of coverage for the Policy on March 16, 2020. *Id.* ¶ 25. Wilmington relied on these actions as assurances that the Policy was in-force and would not be challenged upon Goldman's death. *Id.*

On March 30, 2020, Goldman passed away. *Id.* ¶ 26. Wilmington, acting on behalf of the beneficial owner of the policy, submitted a claim for the Policy's death benefit on May 22, 2020. *Id.* ¶ 27.

Columbus did not pay the claim, and instead filed a Complaint against Wilmington on June 29, 2020. D.E. 1. The Complaint raises two causes of action. First, it seeks a declaratory judgment

that the Policy was an illegal wagering contract in violation of New Jersey law. *Id.* ¶¶ 28-32. Second, it seeks a declaratory judgment that the Policy lacked an insurable interest. *Id.* ¶¶ 33-36. Wilmington filed an Answer, D.E. 6, which asserts five affirmative defenses: (1) failure to state a claim; (2) laches; (3) waiver and estoppel; (4) unclean hands; and (5) "any and all affirmative defenses that may become apparent during discovery." Ans. at 12-14. Wilmington also raises five Counterclaims: Count One: breach of contract; Count Two: breach of the implied covenant of good faith and fair dealing; in the alternative to Counts One and Two, Count Three: promissory estoppel; Count Four: unjust enrichment; and Count Five: negligent misrepresentation. CC ¶¶ 36-69. Wilmington seeks a declaration that Columbus is liable to pay the $5 million death benefit or, in the alternative, seeks to be awarded a return of all of the premiums it paid to Columbus over the life of the Policy, among other relief.

Columbus filed the present motions to dismiss counterclaims and strike affirmative defenses on September 25, 2020. D.E. 9, 10. Columbus seeks to dismiss Counts Three (promissory estoppel), Four (unjust enrichment), and Five (negligent misrepresentation) of Wilmington's counterclaims, and to strike Wilmington's affirmative defenses of laches, waiver and estoppel, and unclean hands.

## II. STANDARD OF REVIEW

### A. Motion to Strike

Rule 12(f) of the Federal Rules of Civil Procedure states that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The decision is discretionary. *F.T.C. v. Hope Now Modifications, LLC*, No. 09-1204, 2011 WL 883202, at *1 (D.N.J. Mar. 10, 2011). However, "[a]s a general matter, motions to strike under Rule 12(f) are highly disfavored." *Thompson v. Real Estate Mortg.*

*Network, Inc.*, No. 11-1494, 2018 WL 4604310, at *2 (D.N.J. Sept. 24, 2018) (citing *F.T.C*, 2011 WL 883202, at *1).

Rule 12(f) sets forth two standards for striking matter from a pleading: (1) "an insufficient defense," or (2) "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). First, "[a]n affirmative defense is insufficient if 'it is not recognized as a defense to the cause of action.'" *F.T.C.*, 2011 WL 883202, at *2 (quoting *Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 217 (D.N.J.1993)). Thus, a motion to strike an affirmative defense "will only be granted 'when a defense is legally insufficient under any set of facts which may be inferred from the allegations of the pleading.'" *F.D.I.C. v. Modular Homes, Inc.*, 859 F. Supp. 117, 120 (D.N.J. 1994) (quoting *Glenside West Corp. v. Exxon Corp.*, 761 F. Supp. 1100, 1115 (D.N.J.1991)). Second, "even where the challenged material is redundant, immaterial, impertinent, or scandalous, a motion to strike should not be granted unless the presence of the surplusage will prejudice the adverse party." *Id.* Indeed, motions to strike "will generally 'be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.'" *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 609 (D.N.J. 2002) (quoting *Tonka*, 836 F. Supp. at 217).

### B. Motion to Dismiss Counterclaims

"Courts use the same standard in ruling on a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) as they do for a motion to dismiss a complaint." *RBC Bank (USA) v. Petrozzini*, No. 12-155, 2012 WL 1965370, at *2 (D.N.J. May 31, 2012). Under this standard, the counterclaim must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a counterclaim, the court

must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). A court will, however, accept the counterclaim's well-pleaded facts as true. *Fowler*, 578 F.3d at 210.

On a Rule 12(b)(6) motion to dismiss, a district court may not rely on matters extraneous to the pleading sought to be dismissed. Fed. R. Civ. P. 12(d). A motion to dismiss a counterclaim must be decided "on the face of the counterclaim." *Lukoil N. Am. LLC v. Turnersville Petroleum Inc.*, 2015 WL 5455648, at *1 (D.N.J. Sept. 16, 2015). However, in certain circumstances, a court may also consider undisputed and authentic exhibits as well as matters of public record. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997).

## III. ANALYSIS

In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The parties agree that New Jersey law governs this dispute. D.E. 1 ¶ 29; Opp. Br. at 7. Seeing no clear reason to deviate from the parties' assumptions, the Court will apply New Jersey law. *See Manley Toys, Ltd. v. Toys "R" Us, Inc.*, No. 12-3072, 2013 U.S. Dist. LEXIS, at *5 (D.N.J. Jan. 22, 2013) ("Because the parties have argued the viability of the . . . claims as though New Jersey substantive law applies, the Court will assume that to be the case." (citing *USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999))).

### A. New Jersey Law on STOLI Policies

The Court first reviews the New Jersey Supreme Court's decision in *Sun Life Assurance Company of Can. v. Wells Fargo Bank, N.A.*, 208 A.3d 839 (N.J. 2019), which the parties agree is

pertinent, controlling law. Moving Br. at 8, n.5; Ans. at 11. There, the New Jersey Supreme Court considered two questions of law certified by the Third Circuit: "(1) Does a life insurance policy that is procured with the intent to benefit persons without an insurable interest in the life of the insured violate the public policy of New Jersey, and if so, is that policy void *ab initio*?" and "(2) If such a policy is void *ab initio*, is a later purchaser of the policy, who was not involved in the illegal conduct, entitled to a refund of any premium payments that they made on the policy?" *Sun Life*, 208 A.3d at 843.

The *Sun Life* court answered the first question in the affirmative. First, it determined that "[i]f a third party without an insurable interest procures or causes an insurance policy to be procured in a way that feigns compliance with the insurable interest requirement, the policy is a cover for a wager on the life of another and violates New Jersey's public policy." *Id.* at 849. The New Jersey Supreme Court also noted that "an incontestability provision does not bar a challenge to a STOLI policy" because "insurance contracts that are contrary to public policy cannot be enforced despite an incontestability clause." *Id.* at 851. The court in *Sun Life* explained that "[i]f a policy never came into effect, neither did its incontestability clause; the clause thus cannot stand in the way of a claim that the policy violated public policy because it lacked an insurable interest." *Id.* The court continued that in some situations, however, it may not be clear whether the policy was procured by a STOLI arrangement. *Id.* at 851. According to the *Sun Life* court, to determine whether "a third party without an insurable interest may have caused the policy to be procured," several factors are important to consider, including: "the nature and timing of any discussions between the purchaser and the strangers; the reasons for the transfer; and the amount of time the policy was held." *Id.*

As to the second part of the first question – whether such a policy is void *ab initio* – the New Jersey Supreme Court determined that "[w]hen an insurance policy violates public policy, it is as though the policy never came into existence" and, as a result "[t]he policy would be void from the outset." *Id.* at 857.

In response to the second certified question, the court in *Sun Life* concluded that "a party may be entitled to a refund of premium payments it made on the policy, depending on the circumstances." *Id.* at 859. The New Jersey Supreme Court found that courts should employ a fact-sensitive approach in cases of void STOLI policies to assess the parties' relative culpability in determining whether premium payments should be refunded. *Id.* at 858-59. The *Sun Life* court explained as follows:

> To decide the appropriate remedy, trial courts should develop a record and balance the relevant equitable factors. Those factors include a party's level of culpability, its participation in or knowledge of the illicit scheme, and its failure to notice red flags. Depending on the circumstances, a party may be entitled to a refund of premium payments it made on a void STOLI policy, particularly a later purchaser who was not involved in any illicit conduct.

*Id.* at 859.

## B. Affirmative Defenses

Three affirmative defenses asserted are implicated in the present motion to strike. Wilmington asserts that Columbus' claims are barred by the doctrine of laches because "Columbus unreasonably, unexplainably, and inexcusably delayed filing its claims for nearly thirteen years while the facts relied upon by Columbus for its claims were known to Columbus at or around the time the Policy was initially issued." Ans. at 13. Wilmington next claims the defense of waiver and estoppel, arguing that Columbus waived its claims against Wilmington by waiting to bring its claims until nearly eleven years after the Policy became incontestable. *Id.* Wilmington also asserts the defense of unclean hands, arguing that Columbus acted in bad faith by collecting

the Policy's premiums for nearly thirteen years and representing to Wilmington – along with its predecessors-in-interest – that the Policy was valid and in force, "while secretly intending to challenge the Policy as void *ab initio*." *Id.* at 14.

Columbus's motion to strike does not argue that Wilmington failed to sufficiently plead the elements of its affirmative defenses. Instead, it contends that these equitable defenses are not available because under well-settled New Jersey law, courts can never enforce illegal agreements, like STOLI polices, that are void *ab initio* as against public policy. Moving Br. at 11. Columbus cites to numerous cases from New Jersey courts and the District of New Jersey which found that laches and waiver and estoppel cannot apply to contracts that are void. *Id.* at 11-12. Columbus also cites to decisions from other jurisdictions which have found that the doctrine of unclean hands cannot sustain a contract that is void *ab initio*. *Id.* at 14-18. Columbus argues that because these equitable doctrines are not capable of sustaining a void *ab initio* policy, they are not relevant to the question of the Policy's enforceability. *Id.* at 13.

"Laches is an equitable doctrine, operating as an affirmative defense that precludes relief when there is an 'unexplainable and inexcusable delay' in exercising a right, which results in prejudice to another party." *Fox v. Millman*, 45 A.3d 332, 341 (N.J. 2012) (quoting *County of Morris v. Fauver*, 707 A.2d 958, 970 (1998)). Under New Jersey law, the equitable defense of laches does not apply to contracts that are void. *Jersey City v. Roosevelt Stadium Marina*, 509 A.3d 808, 816 (N.J. Super. Ct. App. Div. 1986).

"Waiver, under New Jersey law, involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." *Shebar v. Sanyo Bus. Sys. Corp.*, 544 A.2d 377, 384 (N.J. 1988). Estoppel is an equitable doctrine "designed to prevent injustice by not permitting

a party to repudiate a course of action on which another party has relied to his detriment." *Knorr v. Smeal*, 836 A.2d 794, 799 (N.J. 2003). "Estoppel, unlike waiver, requires the reliance of one party on another." *Id.* "The doctrine of estoppel or waiver asserted cannot be invoked to enforce an agreement which is void as against public policy." *McCarthy v. National Ass'n for Stock Car Auto Racing, Inc.*, 218 A.2d 871, 873 (N.J. Super. Ct. App. Div. 1966).

The "essence" of the equitable doctrine of unclean hands "is that '[a] suitor in equity must come into court with clean hands and he must keep them clean after his entry and throughout the proceedings.'" *Borough of Princeton v. Bd. of Chosen Freeholders*, 777 A.2d 19, 32 (N.J. 2001) (quoting *A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.*, 66 A.2d 319, 324 (N.J. 1949). The doctrine "is 'discretionary on the part of the court.'" *Id.* (quoting *Heuer v. Heuer*, 704 A.2d 913, 919 (N.J. 1998). Columbus does not cite, and the Court was unable to locate, any New Jersey case law explicitly stating whether the equitable defense of unclean hands can be invoked to enforce a contract that is void. However, as a "general rule," "[a] contract which is void *ab initio*, or void from the beginning, may not be enforced." *First Am. Title Ins. Co. v. Lawson*, 827 A.2d 230, 242 (N.J. 2003) (LaVecchia, J., dissenting) (alteration in original) (quoting *Mass. Mun. Wholesale Elec. Co. v. Town of Danvers*, 577 N.E.2d 283, 292-93 (Mass. 1991). "'[J]udicial or equitable doctrines cannot breathe life into such a contract' given that 'courts treat the contract as if it had never been made.'" *Id.* (quoting *Mass. Mun. Wholesale Elec. Co.*, 577 N.E.2d at 292-93).

STOLI contracts are "void from the outset." *Sun Life*, 208 A.3d at 857. As a result, if the Policy here is ultimately determined to be a STOLI arrangement, the equitable defenses of laches, waiver and estoppel, and unclean hands cannot be asserted to sustain the Policy. In other words, if Columbus proves that Policy is a STOLI contract, then the affirmative defenses will not be available to Wilmington. But if Columbus does not prevail, then the affirmative defenses will be

unnecessary. Because the affirmative defenses cannot bar Columbus's claim for declaratory judgment on the grounds that the policy is void *ab initio*, the defenses are "legally insufficient under any set of facts which may be inferred from the allegations of the pleading[.]" *Modular Homes*, 859 F. Supp. at 120. The Court grants Columbus's motion to strike.

### C. Counterclaims

Columbus also moves to dismiss three of Wilmington's counterclaims: promissory estoppel (Count Three); negligent misrepresentation (Count Five); and unjust enrichment (Count Six).

#### i. Promissory Estoppel

The parties do not appear to contest whether Wilmington has sufficiently pled promissory estoppel. Instead, the parties dispute whether a promissory estoppel counterclaim can proceed if the Policy is declared void *ab initio*. Columbus argues that the promissory estoppel counterclaim should be dismissed for the same reasons that the affirmative defenses should be stricken. Moving Br. at 10-11, 19. Wilmington responds that New Jersey courts allow promissory estoppel claims to proceed, even when a contract is alleged to be void *ab initio*; in support, Wilmington cites two cases from the District of New Jersey. Opp. Br. at 25-26. First, Wilmington cites to *Wells Fargo Bank Northwest, N.A. v. American General Life Insurance Co.*, No. 10-1327, 2011 WL 1899338 (D.N.J. May 19, 2011). In that case, although American General alleged that the policy at issue was void *ab initio*, the court permitted Wells Fargo, acting on behalf of a trust, to amend its complaint to add a promissory estoppel claim. 2011 WL 1899338, at *1, *8. The alleged promise was American General's assurance that it would not contest the Policy after it had been in issuance for two years. *Id.* at *8. However, this case was decided before the New Jersey Supreme Court's *Sun Life* decision, which explicitly ruled that "an incontestability provision does not bar a

challenge to a STOLI policy" and explained that "[i]f a policy never came into effect, neither did its incontestability clause; the clause thus cannot stand in the way of a claim that the policy violated public policy because it lacked an insurable interest." *Sun Life*, 208 A.3d at 851. Thus, the reasoning in *American General*, on which Wilmington relies, is no longer viable after *Sun Life*.

Second, Wilmington cites *Weiss, Trustee for Robinson v. Banner Life Insurance Co.*, where the district court permitted a promissory estoppel claim to survive summary judgment after permitting the rescission of the life insurance contract at issue. No. 05-4893, 2008 WL 11509888, (D.N.J. Apr. 16, 2008). The contract is *Weiss* was not violative of public policy. Rather, it was rescinded for a misrepresentation made in the application to reinstate a life insurance policy.

Wilmington's counterclaim asserts that "[t]he only way to avoid injustice" is for this Court to "require Columbus to live up to its promises that the Policy is valid, enforceable, and incontestable and order Columbus to pay [Wilmington] the $5 million face amount on the Policy . . . or alternatively, to pay [Wilmington] all premiums paid on the Policy since inception plus interest." *Id.* ¶ 56. But under New Jersey law, if the Policy is found to be void *ab initio*, this Court cannot order Columbus to abide by the terms of an agreement that "never came into existence." *Sun Life*, 208 A.3d at 857. As a result, Wilmington's promissory estoppel counterclaim is not cognizable if the Policy is determined to be void *ab initio*. The Court grants Columbus's motion to dismiss Counterclaim Count Three.

### ii. Negligent Misrepresentation

Columbus argues that Wilmington's negligent misrepresentation counterclaim fails insofar as it attempts to enforce the Policy's death benefit and, to the extent the counterclaim seeks damages other than enforcing the Policy, it fails because Wilmington has not and "cannot plausibly allege" the elements of the counterclaim. Reply at 7. Specifically, Columbus argues that

12

Wilmington did not and cannot plausibly allege that Columbus negligently provided false information, Moving Br. at 19-23; that Columbus had a duty to disclose, *id.* at 23-24; that Wilmington reasonably relied on Columbus's statements, *id.* at 24-28; and that Wilmington was damaged, *id.* at 28.

"In order to sustain a cause of action based on negligent misrepresentation, the plaintiff must establish that the defendant negligently made an incorrect statement of a past or existing fact, that the plaintiff justifiably relied on it and that his reliance caused a loss or injury." *Masone v. Levine*, 887 A.2d 1191, 1195 (N.J. Super. Ct. App. Div. 2005). Wilmington submits that "Columbus supplied false information by repeatedly representing" (1) that Columbus viewed the Policy as a legitimate life insurance policy; (2) that Wilmington (and its predecessors-in-interest) were the Policy's owner and beneficiary; and (3) that so long as Wilmington paid the Policy's premiums, Columbus intended to pay $5 million upon Goldman's death. CC ¶ 65. Wilmington continues that Columbus was negligent in making these statements because it "knew or should have known that they were false" and that it needed to disclose its true intentions "because [Wilmington] and its predecessors-in-interest were relying on this information to determine whether to acquire the Policy . . . and whether to continue paying premiums on the policy after its acquisition." *Id.* ¶ 66.

Based on the following allegations, Wilmington asserts that Columbus falsely stated that the Policy was legitimate. After Wilmington procured the Policy, Columbus "continued to provide [Wilmington] with verifications that the Policy was in force, including soliciting premium payments annually." *Id.* ¶ 25. Additionally, Columbus continued to provide Wilmington with a notice of annual premiums due, which Wilmington paid as required. *Id.* And on March 16, 2020, Columbus provided Wilmington with a verification of coverage for the Policy. *Id.* Columbus

knew this was false, Wilmington alleges, because it "has known since the issuance of the Policy of the facts that form the basis of its claim in this litigation that the Policy is void." *Id.* ¶ 31. Wilmington continues that, despite this knowledge, Columbus "opted to keep the Policy in force in order to collect as much money as possible in premiums over the next thirteen years." *Id.*

Wilmington fails to allege any plausible facts to support its assertion that Columbus knew, or should have known, that the Policy was unenforceable when it was procured in 2007. It was not until June 4, 2019 that the New Jersey Supreme Court issued its decision in *Sun Life*, which declared STOLI policies void as against public policy. As a result, the Court finds that any alleged false statements about the Policy's legitimacy that were communicated by Columbus to Wilmington prior to June 4, 2019 cannot serve as the basis for a negligent misrepresentation claim because Wilmington has failed to sufficiently allege that the statements were false at the time they were made.

One alleged false communication concerning the Policy's validity occurred after that date. On March 16, 2020, Columbus provided Wilmington with a verification of coverage for the Policy. *Id.* ¶ 25. Columbus contends that the verification of coverage does not explicitly state that the Policy was "valid," "in force." or "legitimate." Moving Br. at 21. Based on the title of the document – "verification of coverage" – along with information provided on the document, including the value of the Policy, the net death benefits, and the last date the annual premium was paid, the Court finds that Wilmington has plausibly alleged that this document communicated the allegedly false statement that the Policy was in force as of March 16, 2020. D.E. 10-3 at 7-8. Because this document was issued after the *Sun Life* decision, the Court concludes that Wilmington has plausibly alleged that Columbus negligently made a false statement concerning the Policy's legitimacy. Wilmington also adequately alleges that it justifiably relied on this statement as an

"assurance[] that the Policy was still in-force and would not be challenged upon Goldman's death."
CC ¶ 25. However, Wilmington does not sufficiently allege the remaining element of a negligent misrepresentation claim – that its reliance caused a loss or injury – with respect to the March 16, 2020 communication. On March 30, 2020, two weeks after the date of the verification of coverage, Goldman passed away. CC ¶ 26. Wilmington does not allege that it made any additional premium payments or otherwise acted in reliance on Columbus's false statements in the period between the March 16, 2020 letter and Goldman's death.

For the foregoing reasons, the Court finds that Wilmington fails to state a claim for negligent misrepresentation based on Columbus's false statements concerning the legitimacy of the Policy.

Next, the Court considers whether Wilmington stated a negligent misrepresentation claim based on Columbus's statements that Wilmington was the owner and beneficiary of the Policy. Wilmington argues that "Columbus's representations that it viewed [Wilmington] as the owner and beneficiary of the Policy were false and misleading" because if the Policy never came into existence, it could not have an owner or beneficiary. Wilmington concedes in its counterclaims that "[t]here is no dispute" that it "is the sole owner and beneficiary of the Policy." CC ¶ 4. As a result, the Court finds that Wilmington has failed to adequately allege that Columbus negligently made a false or misleading statement concerning Wilmington being the Policy's owner and beneficiary. Moreover, Wilmington alleges that the relevant communications occurred on January 3 and 4, 2019. *Id.* ¶ 23. As discussed above, Wilmington fails to allege any facts to support its assertion that Columbus knew the Policy was void *ab initio* – and therefore, that Wilmington could not have owned or been the beneficiary of this non-existent policy – prior to the *Sun Life* decision on June 4, 2019. As a result, Columbus's statements concerning the Policy's owner and

beneficiary on January 3 and 4, 2019 cannot serve as the basis for a negligent misrepresentation claim.

Finally, the Court considers whether Wilmington stated a claim for negligent misrepresentation based on Columbus's statements that it would pay the $5 million death benefit upon Goldman's death so long as Wilmington paid the Policy's premiums. As an initial matter, the Court notes that, contrary to Columbus' contention, this statement does appear in the Policy: "We [(Columbus)] agree to pay the Death Benefit to the Beneficiary when We receive proof of the death of the Insured while this policy is in force, subject to the terms of this policy." D.E. 9-2 at 2. This Policy document is not dated. If the Policy is the one originally issued, then the statement was made in November 2007.

The parties dispute whether this statement – which they apparently concede is a statement of future intent – can form the basis of a negligent misrepresentation claim. Columbus argues that statements about future or contingent events cannot constitute misrepresentations, even if they turn out to be wrong. Moving Br. at 22. Wilmington submits that New Jersey law recognizes that promises concerning future events can be actionable misrepresentations if the promiser had no intention of fulfilling its promise. Opp. Br. at 10-11. The parties do not cite to any New Jersey precedent. Courts in the District of New Jersey, applying New Jersey law, have explained that "a mere promise to do something in the future, which goes unfulfilled, does not constitute fraud unless the promisor had no intention of keeping such promise at the time it was made." *Stolba v. Wells Fargo & Co.*, No. 10-6014, 2011 WL 3444078, at *4 (D.N.J. Aug. 8, 2011); *Wells Fargo Bank Nw, N.A. v. Am. Gen. Life Ins. Co.*, No. 10-1327, 2011 WL 1899338, at *5 (D.N.J. May 19, 2011); *Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT*, 106 F. Supp. 2d 606, 623 (D.N.J. 1999).

Wilmington alleges that Columbus had no intention of fulfilling this promise at the time it was made. CC ¶ 34. But as discussed previously, Wilmington fails to plausibly allege facts to support this statement. Assuming the Policy document was issued at the Policy's inception, Wilmington has not plausibly alleged that Columbus had reason to know in November 2007 that the Policy was void *ab initio* and, therefore, that Columbus made the promise to pay the death benefit with no intention to follow through on that promise.[4] The Court thus concludes that Wilmington has failed to sufficiently state a claim for negligent misrepresentation.

### iii. Unjust Enrichment

Count Four of Wilmington's counterclaims alleges unjust enrichment, which is pled in the alternative to Wilmington's counterclaims for breach of contract (Count One) and breach of the implied covenant of good faith and fair dealing (Count Two). CC ¶¶ 57-62. If the Policy is deemed void *ab initio*, Wilmington asserts it "should receive the value paid for the policy, the value of all premiums paid on the Policy since inception, plus applicable interest, attorney's fees, and other costs and damages." *Id.* ¶¶ 61-62. Columbus argues that this counterclaim should be dismissed because, although the New Jersey Supreme Court instructed that a party might be entitled to a refund of premium payments made on a STOLI policy, that remedy is typically applied only in cases where one party was induced by fraud, coercion, or undue influence. Moving Br. at 29-30. Columbus submits that Wilmington fails to allege that either it or the third-party investor acted as a result of fraud, coercion, or undue influence. *Id.* Wilmington responds that the decision as to whether premiums should be refunded should be made on a full evidentiary record and it is premature to make such a finding on a motion to dismiss. Opp Br. at 34-35.

---

[4] If the statement was not made when the Policy was issued, Wilmington's claim is still insufficient because it fails to allege when the statement was made and that Columbus knew that the Policy was void *ab initio* at the time the statement was made.

The Court agrees with Wilmington. In *Sun Life*, the New Jersey Supreme Court ruled that in some situations, a party may be entitled to a refund of premium payments it made on a STOLI policy. 208 A.3d at 859. The court explained that to decide the appropriate remedy in cases of void STOLI policies, courts should employ a "fact-sensitive approach" and should "develop a record and balance the relevant equitable factors," including "a party's level of culpability, its participation in or knowledge of an illicit scheme, and its failure to notice red flags." 208 A.3d at 859. Wilmington may ultimately be entitled to a refund on premiums it paid on the Policy; however, this Court finds it premature to make any determination on these equitable factors at the motion to dismiss stage. As a result, Columbus's motion to dismiss Wilmington's counterclaim for unjust enrichment is denied.

## IV.     CONCLUSION

For the reasons set forth above, Plaintiff/Counterclaim Defendant's motion to strike is **GRANTED**, and its motion to dismiss is **GRANTED in part and DENIED in part.** An appropriate Order accompanies this Opinion.

Dated:        April 30, 2021

_____
John Michael Vazquez, U.S.D.J.